**FILED**

APR 1 7 2007

U.S. DISTRICT COURT
WHEELING, WV 26003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

          Plaintiff,

v.

CIVIL ACTION NO. 5:07-CV-50

LEONARD REYNOLDS, D.P.M.

          Defendants.

## COMPLAINT

The United States of America brings this action against Leonard Reynolds, D.P.M. under the False Claims Act, 31 U.S.C. § 3729, *et seq.* and the common law seeking damages, civil penalties and restitution.

### PARTIES

1. The Plaintiff is the United States of America ("United States').

2. The Defendant, Leonard Reynolds, D.P.M. ("Dr. Reynolds"), is a resident of Brooke County, West Virginia, whose last known place of residence is in Wellsburg, West Virginia.

### JURISDICTION AND VENUE

3. This action is properly in the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. § 1345. Venue is proper pursuant to 28 U.S.C. § 1391.

### STATEMENT OF FACTS

#### BACKGROUND

4. Dr. Reynolds is a doctor of podiatric medicine duly licensed to practice podiatry in the State of West Virginia. At all times relevant to the allegations contained herein, Dr. Reynolds

limited his practice to general podiatry.

5. At all times relevant to the allegations contained herein, Dr. Reynolds' podiatry practice had its principal place of business in Wheeling, Ohio County, West Virginia.

6. Medicaid is a welfare program co-funded by the United States and state governments. The Medicaid program was established to provide necessary and appropriate health care for the poor and impoverished who are aged, blind or disabled or members of families with dependent children. Individuals insured by Medicaid are known as "recipients." Approximately 75% of the funding for the West Virginia Medicaid program is provided by the government of the United States of America.

7. In the State of West Virginia, the Medicaid program is administered by the West Virginia Department of Health and Human Resources ("DHHR"), through the Bureau for Medical Service ("BMS").

8. In order to receive reimbursement from Medicaid for services provided to Medicaid recipients who reside in West Virginia, health care providers are required to enter into a Medicaid enrollment agreement with DHHR. By signing the agreement, the providers agree to abide by the rules, regulations, policies and procedures of the Medicaid Program.

9. Upon enrollment in the Medicaid program, providers receive a Medicaid manual which includes Medicaid rules and regulations. The Manual contains coding procedures and rules for medical services provided. Enrolled providers periodically receive program instructions which update the manual.

10. Prior to the events described in this Complaint, Dr. Reynolds signed a Medicaid enrollment agreement. Consequently, Dr. Reynolds received a copy of the Medicaid manual and, thereafter, received program instructions which updated the manual.

11. Medicare is a federal program established by Congress to provide health insurance for the elderly and disabled. It is administered through the United States Department of Health and Human Services ("HHS"). More specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS, administers the program.

12. Individuals insured through the Medicare program are known as "beneficiaries". The daily administration and operation of the Medicare program is managed through numerous contractors known as intermediaries ("Medicare Intermediary"). The integrity of the Medicare Program is monitored by other contractors known as program safeguard contractors ("PSC"). The PSC for West Virginia is AdvanceMed.

13. Prior to the events described in this Complaint, Dr. Reynolds signed a Medicare enrollment agreement. Contemporaneously, Dr. Reynolds received a copy of the Medicare Manual and, thereafter, received program instructions, memoranda and reports which updated the Manual.

14. Health care providers are reimbursed for services to Medicaid recipients and Medicare beneficiaries through the submission of paper claim forms or an electronic equivalent. At all times relevant to the allegations contained herein, the paper claim forms were known as HCFA 1500 or CMS 1500 Forms (all such claim forms and/or their electronic equivalent are referred to herein as "claims").

15. The information in claims submitted to Medicare and Medicaid include the name, address, and other identifying information of the recipient or beneficiary, the date and nature of the service provided, the charge for the service, identifying information about the provider and the certification by the provider that the service for which reimbursement is sought was actually rendered by the provider or incident to his/her care and was medically necessary.

16. Medical services for which reimbursement is sought are identified on claims through the use of a uniform coding system set forth in a manual entitled, *Physicians Current Procedural Terminology* ("CPT Manual").

17. The CPT manual is published annually by the American Medical Association. The codes contained therein are known as "CPT codes."

18. DHHR also issues and uses supplemental or corresponding billing codes when necessary to meet the needs of the Medicaid Program.

19. DHHR and the Medicare Intermediary rely on the claims (electronic or paper forms) submitted and the certifications made thereon and reimburse providers for covered services at a predetermined rate pursuant to the information contained in said claims.

20. At all times relevant to the allegations in this Complaint, Dr. Reynolds was an authorized Medicaid provider.

21. At all times relevant to the allegations contained in this Complaint, Dr. Reynolds was an authorized Medicare provider.

## THE FRAUDULENT PRACTICES

### Evaluation and Management Services Not Rendered

22. The CPT manual contains codes for both new and established patients and for varying levels of service. These codes are used to report evaluation and management services provided in a physician's office or other outpatient setting ("E/M services"). These codes are known as office visit codes or evaluation and management codes ("E/M codes").

23. Nail debridement (CPT codes 11720 and 11721) is considered a minor surgical procedure.

24. On occasions when a podiatrist performs a minor surgical procedure, the podiatrist may not submit a claim for an office visit unless the patient's condition or presenting problem(s) required a significant, separately identifiable E/M service above and beyond the minor surgical procedure.

25. When a patient's condition or presenting problem(s) require a significant, separately identifiable E/M service above and beyond the minor surgical procedure the office visit service is reported on the claim by adding the CPT Manual modifier "-25" to the appropriate level of E/M service.

26. From on or about January 1, 1999 to on or about June 30, 2005, Dr. Reynolds engaged in a scheme and/or conduct to defraud the Medicaid and Medicare programs by submitting false and fraudulent claims for E/M services that were not rendered. Specifically, Dr. Reynolds would routinely submit, or caused to be submitted, claims for E/M services, reportedly rendered on the same day that a nail debridement or other minor surgical procedure was performed. With respect to said claims, Dr. Reynolds added, or caused to be added, a "-25" modifier to the E/M CPT code even though a significant, separately identifiable E/M service above and beyond the minor surgical procedure was not rendered.

27. One particular example of a false "-25" modifier E/M claim that was submit by Dr. Reynolds is a claim submitted to Medicaid for services reportedly rendered to patient JB[1]. The relevant facts of the JB claim are as follows:

    a. JB was seen by Dr. Reynolds at the patient's home on November 12, 2001.

---

[1] In this Complaint patients will be identified through the use of initials in order to preserve privacy. A separate document providing the names of the patients will be provided to the defendant and the Court.

    b.    On November 12, 2001, JB was a Medicaid recipient.

    c.    On November 12, 2001, Dr. Reynolds performed a nail debridement procedure on JB.

    d.    On the claim he submitted to Medicaid for the service provided to JB on November 12, 2001, Dr. Reynolds included the nail debridement code <u>and</u> a 99341 E/M code (evaluation and management service in patient's home) with a "-25" modifier added. By including the 99341 E/M code with a "-25" modifier added, Dr. Reynolds represented to Medicaid that he had rendered a significant, separately identifiable E/M service above and beyond the nail debridement procedure.

    e.    The only service provided by Dr. Reynolds to JB on November 12, 2001 was the nail debridement procedure. Dr. Reynolds did not provide an E/M service to JB on that date.

    f.    Medicaid paid Dr. Reynolds $42.44 for the "-25" E/M service claim.

28.    A second example of a false "-25" modifier E/M claim that was submit by Dr. Reynolds is a claim submitted to Medicaid for services reportedly rendered to patient RH. The relevant facts of the RH claim are as follows:

    a.    RH was seen by Dr. Reynolds at his office on January 24, 2003.

    b.    On January 24, 2003, JB was a Medicaid recipient.

    c.    On January 24, 2003, Dr. Reynolds performed a flat wart destruction procedure (CPT code 17110) on RH.

    d.    On the claim he submitted to Medicaid for the service provided to RH on

January 24, 2003, Dr. Reynolds included the destruction procedure code <u>and</u> a 99212 E/M code (evaluation and management office visit with established patient) with a "-25" modifier added. By including the 99212 E/M code with a "-25" modifier added, Dr. Reynolds represented to Medicaid that he had rendered a significant, separately identifiable E/M service above and beyond the nail debridement procedure.

    e.    The only service provided by Dr. Reynolds to RH on January 24, 2003 was the nail debridement procedure. Dr. Reynolds did not provide an E/M service to RH on that date.

    f.    Medicaid paid Dr. Reynolds $27.04 for the "-25" E/M service claim.

29.    Another example of a false "-25" modifier E/M claim that was submit by Dr. Reynolds is a claim submitted to Medicaid for services ostensibly rendered to patient DS. The relevant facts of the DS claim are as follows:

    a.    DS was seen by Dr. Reynolds at his office on November 4, 2003.

    b.    On November 4, 2003, DS was a Medicaid recipient.

    c.    On November 4, 2003, Dr. Reynolds performed a nail debridement procedure on DS.

    d.    On the claim he submitted to Medicaid for the service provided to DS on November 4, 2003, Dr. Reynolds included the nail debridement code <u>and</u> a 99212 E/M code (evaluation and management office visit with established patient) with a "-25" modifier added. By including the 99212 E/M code with a "-25" modifier added, Dr. Reynolds represented to Medicaid that he had

        rendered a significant, separately identifiable E/M service above and beyond the nail debridement procedure.

    e.    The only service provided by Dr. Reynolds to DS on January 24, 2003 was the nail debridement procedure. Dr. Reynolds did not provide an E/M service to DS on that date.

    f.    Medicaid paid Dr. Reynolds $26.79 for the "-25" E/M service claim.

30.    One example of a false "-25" modifier E/M claim that was submit by Dr. Reynolds to Medicare is a claim submitted for services ostensibly rendered to patient DK. The relevant facts of the DK claim are as follows:

    a.    DK was seen by Dr. Reynolds at his office on March 27, 2001.

    b.    On March 27, 2001, DK was a Medicare beneficiary.

    c.    On March 27, 2001, Dr. Reynolds performed a nail debridement procedure on DK.

    d.    On the claim he submitted to Medicare for the service provided to DK on March 27, 2001, Dr. Reynolds included the nail debridement code <u>and</u> a 99212 E/M code (evaluation and management office visit with established patient) with a "-25" modifier added. By including the 99212 E/M code with a "-25" modifier added, Dr. Reynolds represented to Medicare that he had rendered a significant, separately identifiable E/M service above and beyond the nail debridement procedure.

    e.    The only service provided by Dr. Reynolds to DK on March 27, 2001 was the nail debridement procedure. Dr. Reynolds did not provide an E/M service to

        DK on that date.

    f.    Medicare paid Dr. Reynolds $26.28 for the "-25" E/M service claim.

31. A second example of a false "-25" modifier E/M claim that was submit by Dr. Reynolds to Medicare is a claim submitted for services reportedly rendered to patient GB. The relevant facts of the GB claim are as follows:

    a.    GB was seen by Dr. Reynolds at GB's home on March 5, 2003.

    b.    On March 5, 2003 , GB was a Medicare beneficiary.

    c.    On March 5, 2003 , Dr. Reynolds performed a nail debridement procedure on GB.

    d.    On the claim he submitted to Medicare for the service provided to GB on March 5, 2003, Dr. Reynolds included the nail debridement code <u>and</u> a 99347 E/M code (evaluation and management home visit with established patient) with a "-25" modifier added. By including the 99347 E/M code with a "-25" modifier added, Dr. Reynolds represented to Medicare that he had rendered a significant, separately identifiable E/M service above and beyond the nail debridement procedure.

    e.    The only service provided by Dr. Reynolds to GB on March 5, 2003 was the nail debridement procedure. Dr. Reynolds did not provide an E/M service to GB on that date.

    f.    Medicare paid Dr. Reynolds $34.76 for the "-25" E/M service claim.

32. Another example of a false "-25" modifier E/M claim that was submit by Dr. Reynolds to Medicare is a claim submitted for services reportedly rendered to patient DM. The

relevant facts of the DM claim are as follows:

    a.    DM was seen by Dr. Reynolds at DM's home on December 3, 2003.

    b.    On December 3, 2003, DM was a Medicare beneficiary.

    c.    On December 3, 2003, Dr. Reynolds performed a nail debridement procedure on DM.

    d.    On the claim he submitted to Medicare for the service provided to DM on December 3, 2003, Dr. Reynolds included the nail debridement code _and_ a 99347 E/M code (evaluation and management home visit with established patient) with a "-25" modifier added. By including the 99347 E/M code with a "-25" modifier added, Dr. Reynolds represented to Medicare that he had rendered a significant, separately identifiable E/M service above and beyond the nail debridement procedure.

    e.    The only service provided by Dr. Reynolds to DM on December 3, 2003 was the nail debridement procedure. Dr. Reynolds did not provide an E/M service to DM on that date.

    f.    Medicare paid Dr. Reynolds $34.76 for the "-25" E/M service claim.

33.    The Medicare and Medicaid programs relied on the false and fraudulent "-25" modifier claims submitted by Dr. Reynolds and paid Dr. Reynolds monies to which he was not entitled.

34.    As a direct result of the false and fraudulent "-25" modifier claims submitted by Dr. Reynolds and paid by the Medicare and Medicaid programs from on or about January 1, 1999 to on or about June 30, 2005, the government has sustained a loss of that is currently estimated to exceed

$122,000.00

## Billing For Routine Foot Care

35.     Nail debridement is the process by which a physician or podiatrist debrides the patient's toenails, including tops and exposed undersides, by any method. The cleaning, or debriding, is performed manually with cleansing solutions, abrasive materials and tools. As part of the process, the nails are shortened and shaped.

36.     When the nail care is medically necessary, physicians and podiatrists include nail debridement services on claims submitted to Medicare, Medicaid and other third party payers by using CPT codes 11720 and 11721. CPT code 11720 is used when one to five nails are debrided. CPT code 11721 is used when six or more nails are debrided.

37.     Ordinarily, the trimming or shaping of nails is considered routine foot care.

38.     Routine foot care is not covered by Medicare or Medicaid. The Medicare and Medicaid programs assume that Medicare beneficiaries and Medicaid recipients or a caregiver will perform routine foot care services on their own. Consequently, routine foot care is excluded from coverage under the Medicare and Medicaid programs.

39.     Medicare and Medicaid include within the definition of routine foot care the trimming, cutting, clipping or debriding of nails.

40.     However, Medicare and Medicaid recognize exceptions to the routine foot care coverage exclusion when medical conditions exist that place the patient at risk of infection and/or injury if a non-professional would provide routine foot care services - including cutting, trimming and shaping of toenails.

41.     The exceptions to the Medicare and Medicaid routine foot care coverage exclusions

include (1) those instances where a systemic condition - such as peripheral vascular conditions, diabetes, or peripheral neuropathies of the extremities - are present and exacerbated by significant circulatory changes; and (2) cases where there is a significant fungal infection of the nails, such as mycotic nails.

42. If there is no systemic condition with significant circulatory changes present or no fungal (i.e. mycotic) infection of the nails, then the trimming, cutting or debriding of toenails is considered routine foot care that is not medically necessary and will not be reimbursed by Medicare or Medicaid.

43. From on or about January 1, 1999 to on or about June 30, 2005, Dr. Reynolds engaged in a scheme and/or conduct to defraud the Medicare and Medicaid programs by submitting false and fraudulent claims for routine foot care. Specifically, Dr. Reynolds regularly submitted claims for routine toenail trimming - using CPT code 11721 (nail debridement, six or more toes) - provided to patients who did not have a systemic condition or fungal infection of the nails and who did not otherwise fit within any of the exceptions to the routine foot care coverage exclusion.

44. An example of a false nail debridement claim that was submit by Dr. Reynolds to Medicare is a claim submitted for routine toenail trimming services provided to patient LK. The relevant facts of the LK claim are as follows:

    a. LK was seen by Dr. Reynolds on August 19, 2004.

    b. On August 19, 2004, LK was a Medicare beneficiary.

    c. On August 19, 2004, Dr. Reynolds reportedly performed a nail debridement procedure on LK.

    d. On the claim he submitted to Medicare for the service provided to LK on

       August 19, 2004, Dr. Reynolds included the 11721 nail debridement CPT code, indicating that he had debrided six or more toenails.

    e.    The service actually provided by Dr. Reynolds to LK on August 19, 2004 was routine toenail trimming (i.e. routine foot care). On August 19, 2004, LK was not suffering from a systemic condition and did not have a fungal infection of the toenails.

    f.    Medicare paid Dr. Reynolds $29.23 for the August 19, 2004 routine foot care service.

45.    A second example of a false nail debridement claim that was submit by Dr. Reynolds to Medicare is a claim submitted for routine toenail trimming services provided to patient IP. The relevant facts of the IP claim are as follows:

    a.    IP was seen by Dr. Reynolds on February 10, 2003.

    b.    On February 10, 2003, IP was a Medicare beneficiary.

    c.    On February 10, 2003, Dr. Reynolds reportedly performed a nail debridement procedure on IP.

    d.    On the claim he submitted to Medicare for the service provided to IP on February 10, 2003, Dr. Reynolds included the 11721 nail debridement CPT code, indicating that he had debrided six or more toenails.

    e.    The service actually provided by Dr. Reynolds to IP on February 10, 2003 was routine toenail trimming (i.e. routine foot care). On February 10, 2003, IP was not suffering from a systemic condition and did not have a fungal infection of the toenails.

    f.  Medicare paid Dr. Reynolds $27.49 for the February 10, 2003 routine foot care service.

46.  An example of a false nail debridement claim that was submit by Dr. Reynolds to Medicaid is a claim submitted for routine toenail trimming services provided to patient RC. The relevant facts of the RC claim are as follows:

    a.  RC was seen by Dr. Reynolds on October 24, 2001.

    b.  On October 24, 2001, RC was a Medicaid beneficiary.

    c.  On October 24, 2001, Dr. Reynolds reportedly performed a nail debridement procedure on RC.

    d.  On the claim he submitted to Medicaid for the service provided to RC on October 24, 2001, Dr. Reynolds included the 11721 nail debridement CPT code, indicating that he had debrided six or more toenails.

    e.  The service actually provided by Dr. Reynolds to RC on October 24, 2001 was routine toenail trimming (i.e. routine foot care). On October 24, 2001, RC was not suffering from a systemic condition and did not have a fungal infection of the toenails.

    f.  Medicaid paid Dr. Reynolds $21.90 for the October 24, 2001 routine foot care service.

47.  A second example of a false nail debridement claim that was submit by Dr. Reynolds to Medicaid is a claim submitted for routine toenail trimming services provided to patient MB. The relevant facts of the MB claim are as follows:

    a.  MB was seen by Dr. Reynolds on March 19, 2003.

b. On March 19, 2003, MB was a Medicaid beneficiary.

c. On March 19, 2003, Dr. Reynolds reportedly performed a nail debridement procedure on MB.

d. On the claim he submitted to Medicaid for the service provided to MB on March 19, 2003, Dr. Reynolds included the 11721 nail debridement CPT code, indicating that he had debrided six or more toenails.

e. The service actually provided by Dr. Reynolds to MB on March 19, 2003 was routine toenail trimming (i.e. routine foot care). On March 19, 2003, MB was not suffering from a systemic condition and did not have a fungal infection of the toenails.

f. Medicaid paid Dr. Reynolds $22.23 for the March 19, 2003 routine foot care service.

48. The Medicare and Medicaid programs relied on the false and fraudulent 11721 nail debridement claims submitted by Dr. Reynolds and paid Dr. Reynolds money to which he was not entitled.

49. As a direct result of the false and fraudulent 11721 nail debridement claims submitted by Dr. Reynolds and paid by the Medicare or Medicaid programs from on or about January 1, 1999 to on or about June 30, 2005, the government has sustained damages and financial losses.

## COUNT I

50. The United States has a claim under 31 U.S.C. § 3729(a)(1), as amended.

51. The United States realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 49 of this Complaint.

52. Dr. Reynolds knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

53. Therefore, the defendants are liable to the United States for a civil penalty of not less than $5,000.00 and not more than $10,000.00 or not less than $5,500.00 and not more than $11,000.00 per false claim (depending on the date of the false claim), plus three (3) times the amount of actual damages sustained by the United States and costs associated with the investigation, prosecution and collection of the debt in this matter.

## COUNT II

54. The United States has a claim under 31 U.S.C. § 3729(a)(2), as amended.

55. The United realleges and incorporates herein and by reference each and every allegation contained in paragraphs 1 through 49 of this Complaint.

56. Dr. Reynolds knowingly made, used or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the United States.

57. Therefore, Dr. Reynolds is liable to the United States for a civil penalty of not less than $5,000.00 and not more than $10,000.00 or not less than $5,500.0 and not more than $11,000.00 for false claims (depending on the date of the false claim), plus three (3)times the amount of the actual damages sustained by the United States and costs associated with the investigation, prosecution and collection of the debt in this matter.

## COUNT III

58. The United States has a claim at common law for unjust enrichment.

59. The United States realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 49 of this Complaint.

60. Dr. Reynolds obtained money from the United States to which he was not entitled.

61. By virtue of the acts described herein above, Dr. Reynolds has been unjustly enriched and the Untied States has suffered actual damages as specified herein above.

## COUNT IV

62. The United States has a claim at common law for fraud and deceit.

63. The United States realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 49 of this Complaint.

64. By virtue of the acts described herein above, Dr. Reynolds has perpetrated a fraud and deceit upon the United States and, as a result, the United States has suffered actual damages as specified herein above.

## COUNT V

65. The United States has a claim at common law for unlawful conversion.

66. The United States realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 49 of this Complaint.

67. By virtue of the acts described herein above, Dr. Reynolds has unlawfully converted property of the United States to their own use and, as a result, the United States has suffered actual damages as specified herein above.

WHEREFORE, the United States demands judgment against the defendant as follows:

1. As to Counts I and II, the maximum civil penalty as provided by law in the amount of not less than $5,000.00 and not more than $10,000.00 or not less than $5,500.00 and not more than $11,000.00 per false claim (depending on the date of the false claim) plus three (3) times the amount of actual damages

sustained by the United States plus the cost associated with the investigation, prosecution and collection of the debt in this matter;

2. As to Counts III, IV and V, actual damages incurred by the United States plus the cost associated with the investigation, prosecution and collection of the debt in this matter;

3. Such other relief at law and at equity as this Court deems just and reasonable.

Respectfully submitted,

SHARON L. POTTER
United States Attorney

by: /s/ Alan G. McGonigal
WV Bar No. 6075
Assistant United States Attorney
P. O. Box 591
Wheeling, WV 26003
Phone: (304) 234-0100
Fax: (304) 234-0112